UNITED STATES BANKRUPTCY COURT                              FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------x
In re:                                               :          Chapter 11
                                                     :
VOYAGER DIGITAL HOLDINGS, INC., et al,               :          Case No. 22-10943 (MEW)
                                                     :
                              Debtors.               :          (Jointly Administered)
------------------------------------------------------------------x
BAM TRADING SERVICES INC. d/b/a                      :
BINANCE.US,                                          :
                                                     :
                              Plaintiff,             :          Adv. Pro. No. 24-04049 (MEW)
                    v.                               :
                                                     :
VOYAGER DIGITAL, LLC, VOYAGER                        :
DIGITAL HOLDINGS, INC., VOYAGER                      :
DIGITAL LTD., AND MICHAEL WYSE, IN                   :
HIS CAPACITY AS THE PLAN                             :
ADMINISTRATOR OF THE WIND-DOWN                       :
DEBTOR,                                              :
                                                     :
                              Defendants.            :
------------------------------------------------------------------x

## DECISION REGARDING PLAINTIFF'S
## MOTION TO DISMISS COUNTERCLAIMS

A P P E A R A N C E S :

LATHAM & WATKINS LLP
New York, New York
*Counsel to BAM Trading Services Inc. d/b/a Binance.US*
     By: Robert J. Malionek, Esq.
          Thomas J. Humphrey, Esq.

McDERMOTT WILL & SCHULTE LLP
New York, New York
*Counsel to Michael Wyse, as the Plan Administrator for the Voyager Wind-Down Debtor*
     By: John J. Calandra, Esq.
          Lisa Gerson, Esq.
          Jacob Hollinger, Esq.
          Antonios G. Koulotouros, Esq.

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Plaintiff BAM Trading Services Inc. ("**BAM**") filed this adversary proceeding to recover

a $10 million deposit that it made in connection with an agreement to buy assets from

Debtor/Defendant Voyager Digital, LLC ("**Voyager**").  Voyager, acting through Michael Wyse

(the Plan Administrator for the Wind-Down Debtor that was established under the confirmed

plan of reorganization for Voyager and its affiliates), has filed counterclaims.  BAM has moved

to dismiss Voyager's counterclaims in their entirety.  The motion to dismiss is denied for the

reasons set forth in this Decision.[1]

## Pleading Standards

Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, which incorporates Federal

Rule of Civil Procedure 12(b)(6), permits a bankruptcy court to dismiss claims or counterclaims

in an adversary proceeding if the relevant parts of the pleading fail to state a claim upon which

relief may be granted.  In reviewing a motion to dismiss a court must accept the factual allegations

of a counterclaim as true and draw all reasonable inferences in the claimant's favor.  *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007);

*E.E.O.C. v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).  The factual allegations in

a pleading must be supported by more than mere conclusory statements.  *Twombly*, 550 U.S. at

---

[1]   Two affiliates of Voyager who also were chapter 11 debtors (Voyager Digital Holdings, Inc.
("**Holdings**") and Voyager Digital Ltd. ("**Voyager Ltd.**")) have been named as additional
defendants.  It is not clear why this is the case, since they are not parties to the underlying
contract and the Amended Complaint asserts no claims against them.  It is also not clear
whether any of the counterclaims have been asserted on behalf of Holdings and Voyager
Ltd.; the relevant pleadings just state that the Counterclaims have been asserted by Mr. Wyse
on behalf of the Wind-Down Debtor, which is the entity that is the successor to all three of
the Voyager companies.  No party has moved to dismiss any of the claims or counterclaims
on the theory that Holdings and Voyager Ltd. are not proper parties, so the question of
whether they have any proper role in this proceeding will be left for another day.

555. The allegations must be sufficient "to raise a right to relief above the speculative level" and provide more than a "formulaic recitation of the elements of a cause of action." *Id.* (citations omitted). "[O]nly a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679 (citing *Twombly*, 550 U.S. at 556).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678 (citing *Twombly*, 550 U.S. at 556). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a pleading is insufficient under Fed. R. Civ. P. 8(a) because it has merely "alleged" but not "show[n] . . . that the pleader is entitled to relief." *Id.* at 679; *see also id.* at 682 (allegations in a complaint are insufficient if there is an "obvious alternative explanation" for the conduct alleged that is more "likely") (internal quotation marks and citation omitted).

If a pleading refers to agreements and other documents, it is proper for the Court to consider the documents as part of the pleading in ruling on a motion to dismiss. *Grant v. Cnty. of Erie*, 542 Fed. Appx. 21, 23 (2d Cir. 2013) ("In its review [of a Rule 12(b)(6) motion to dismiss], the court is entitled to consider facts alleged in the complaint and documents attached to it or incorporated in it by reference, documents 'integral' to the complaint and relied upon in it, and facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence."); *Rothman v. Gregor*, 220 F.3d 81, 88–89 (2d. Cir. 2000) (noting that it is proper to consider documents that are quoted in or attached to the complaint or incorporated in it by reference, or that plaintiffs either possessed or knew about and upon which they relied in bringing suit); *I. Meyer Pincus & Assocs., P.C. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir. 1991) (noting that it is proper to consider

3

a document upon which allegations are based, whether or not it is attached to the complaint). If an allegation is belied by the terms of such documents, the documents are controlling. *Id.*; *see also Alexander v. Bd. of Educ. of City of New York*, 648 Fed. Appx. 118 (2d Cir. 2016) (summary order) (dismissing complaint where documents contradicted allegations).

Rule 7009 of the Federal Rules of Bankruptcy Procedure, which incorporates Rule 9(b) of the Federal Rules of Civil Procedure, imposes the additional requirement that allegations of fraud must be stated "with particularity." Fed. R. Bankr. P. 7009; *see also* Fed. R. Civ. P. 9(b). If a pleading alleges that fraudulent misrepresentations were made, for example, then the complaint must specify the statements that the plaintiff contends were fraudulent, identify the speaker, state where and when the statements were made, and explain why the statements were fraudulent. *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 290 (2d Cir. 2006) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir. 1993)). Although "the fraud alleged must be stated with particularity," the requisite intent of the defendant "need not be alleged with great specificity." *Chill v. Gen. Elec. Co.*, 101 F.3d 263, 267 (2d Cir. 1996) (citations omitted). "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b), made applicable by Fed. R. Bankr. Rule 7009. Nevertheless, in order to state a "plausible" claim of fraud a plaintiff "must allege facts that give rise to a strong inference of fraudulent intent." *Lerner*, 459 F.3d at 290 (quoting *Acito v. IMCERA Grp., Inc.*, 47 F.3d 47, 52 (2d Cir. 1995)).

### The Counterclaims

Voyager has asserted four Counterclaims. *See* Voyager's Answer to the Amended Complaint (AP ECF No. 32.)[2] In a few instances below, for clarity and completeness, I have

---

[2]    Citations to "AP ECF" are to the docket in adversary proceeding 24-04049. Citations to "ECF" are to the docket in the main bankruptcy case (Case No. 22-10943).

4

supplemented the allegations of the Counterclaims with quotations from the contract, court

orders and plan of reorganization that were cited and incorporated by reference into the

Counterclaims.

Voyager was a cryptocurrency exchange that filed a chapter 11 bankruptcy petition on

July 5, 2022.  In August 2022 this Court approved bidding procedures for the possible sale of

Voyager's assets.  After a bidding process, Voyager entered into a sale agreement with West

Realm Shires, Inc., a company affiliated with FTX.  However, the deal ended following the

unexpected collapse and bankruptcy of FTX in November 2022.  Voyager then turned to other

prospective purchasers, including BAM.  Counterclaims (AP ECF No. 32), at ¶¶ 29-32.

Voyager and BAM entered into a conditional purchase agreement (one that was subject to

this Court's approval) on December 18, 2022.  They executed an amended Asset Purchase

Agreement (the "**APA**") on January 9, 2023.  The APA contemplated that certain

cryptocurrencies and cash held by Voyager, including the amounts that Voyager's customers and

other creditors eventually would be entitled to receive as distributions under a plan of

reorganization, would be transferred to BAM.  BAM would then make the actual distributions to

Voyager's customers and other creditors that a plan of reorganization would require.  Customers

and creditors also were to have the right (but not the obligation) to become customers of BAM.

*Id.* at ¶¶ 2-3, 32-34, 52.

The failure of FTX had highlighted a potential risk associated with the transmission, to

another cryptocurrency exchange, of assets that were then to be distributed to Voyager's

customers and other creditors.  The values of the distributions that creditors would receive from

Voyager upon confirmation of a plan of reorganization were not expected to equal the full

amounts of the creditors' claims against Voyager.  If those distributions had first been transferred

to FTX, and if Voyager's customers and other creditors had become general unsecured creditors of FTX with respect to the amounts that FTX was supposed to distribute to them, then the distributions would have been subject to potential further reductions to the extent that FTX's own creditors would not be paid in full.  *Id*. at ¶¶ 4, 36, 124, 137-138.

 Voyager alleges that the agreement it negotiated with BAM contained provisions that were meant to ensure that Voyager's customers and other creditors would be protected against these risks.  Section 6.12(e) of the agreement provided that the cryptocurrency assets transferred to BAM would be held "solely in a custodial capacity in trust and solely for the benefit of" Voyager or, as applicable, the Voyager customers and creditors who were entitled to distributions.  Voyager alleges that under basic principles of trust law this provision required BAM to segregate "trust" property from BAM's own property, because in the absence of such a segregation the assets likely would likely be treated as property of BAM's estate in a bankruptcy case.  *Id.* at ¶¶ 36-40.

BAM represented in section 4.2 of the APA that BAM had "all necessary power and authority . . . to perform its obligations hereunder and to consummate the Transactions."  It further covenanted in section 6.12(e)(vi) that it would "not take, permit to be taken, or omit to take any action" that would reasonably be expected to prevent or materially impair or materially delay its ability to perform its obligations.  *Id*. at ¶¶ 5, 40, 42, 108-109.

The Debtors sought this Court's approval of the APA in January 2023.  During a hearing on January 10, 2023, Mr. Tichenor (the Debtor's investment banker) testified that BAM acted as a custodian for its customers and did not view itself as owning the cryptocurrencies that it held for customers.  The Court asked Mr. Tichenor whether the custodial relationship was effected through the wallet infrastructure at BAM and whether there was a segregation of customer

holdings from other holdings.  Mr. Tichenor confirmed that it was his understanding that BAM

segregated customer holdings from other holdings.  When asked to confirm that this is how it

worked, BAM's counsel confirmed that it was.  *Id.* at ¶¶ 53-57.  (The full text of this exchange,

and BAM's current arguments about it, are discussed more fully below.)

I entered an Order on January 13, 2023 that authorized the Debtor to enter into the

amended APA with BAM.  *Id.* at ¶ 60.  My Order explicitly required that "upon the transfer of

any cryptocurrency or cash to [BAM] . . . BAM shall have only nominal title to such

cryptocurrency or cash, which shall be held solely in a custodial capacity in trust and solely for

the benefit of the Seller or the applicable User or Eligible Creditor . . . For the avoidance of

doubt, beneficial title to such cryptocurrency or cash shall remain with the Debtors, or the

applicable User or Eligible Creditor, as applicable."  Order, ECF No. 860, at ¶ 14.  My Order

also made clear that it did not authorize the consummation of the BAM transaction, and that the

consummation of that transaction was contingent upon the consummation of a plan of

reorganization.  *Id.* ¶ 15.

The Court held an additional hearing on March 2 through 7, 2023 to consider

confirmation of Voyager's plan of reorganization.  On March 2, 2023, Mark Renzi, a financial

advisor to the Debtors, was asked under cross-examination whether BAM had represented that it

segregated customer assets from its own assets.  He checked his notes and confirmed, "I believe

that's right."  Similar testimony was again elicited from Mr. Tichenor on March 3, 2023, who

confirmed that BAM held customer assets solely in a custodial capacity.  This Court noted its

own understanding of how the arrangements worked based on the prior hearings, and asked for

further confirmation from BAM that assets would be held in trust and in custody for a reasonable

time after transfer "so that if [a customer] actually wants to make a withdrawal, which was the

7

whole point, somebody wants to actually make a withdrawal without having subjected

themselves to undue risk, they can actually do so."  (Further details about this particular

exchange are discussed below.)  Later during the hearing, the Court asked if BAM would

consider filing a declaration confirming, among other things, that it "keeps customer

cryptocurrency in separate wallets segregated from other cryptocurrencies," noting that there had

been repeated testimony to that effect and that it would be useful to have it confirmed.

Counterclaims (ECF No. 32) at ¶¶ 62-66.

On BAM filed an Officer's Certificate by Erik Kellogg, its Chief Information Security

Officer, in response to the Court's request.  Mr. Kellogg certified that BAM "holds the digital

assets deposited by its customers . . . solely in a custodial capacity and on a one-to-one reserve

basis," that it "segregates the Customer Assets from the Company's digital assets on its general

ledger," and that BAM had the "existing infrastructure to perform its obligations" under the APA.

*Id*. at ¶ 69.

On March 8, 2023, I entered an order confirming the plan of reorganization.  *Id.* at ¶ 72.

That order stated that, for the avoidance of doubt, "each User and Eligible Creditor shall retain . .

. all right, title and interest in and to such Coins and Cash allocated to it on the Binance.US

Platform . . . through and including such time as such Coins and Cash are returned or distributed

to Seller or such User and Eligible Creditor, as applicable, and such Coins and Cash shall be held

by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the

applicable User or Eligible creditor thereafter."  *Id.* ¶ 144; *see also* ECF No. 1166, ¶ 56.  That

provision was consistent with Article IV(C) of the confirmed plan, which stated:

> Notwithstanding anything to the contrary in the Asset Purchase Agreement,
> this Plan, or any Definitive Document, the Debtors, each Account Holder or
> Holder of an Allowed OpCo General Unsecured Claim, as applicable, shall
> retain all right, title, and interest in and to any Cryptocurrency allocated to

such Account Holder or Holder of an Allowed OpCo General Unsecured
Claim pursuant to this Plan through and including such time as such
Cryptocurrency is returned or distributed to the Debtors or such Account
Holder or Holder of an Allowed OpCo General Unsecured Claim, as
applicable, hereunder, and such Cryptocurrency shall be held by Purchaser
solely in a custodial capacity in trust and solely for the benefit of the Debtors
or Account Holder or Holder of an Allowed OpCo General Unsecured Claim,
as applicable, thereafter.

*Id.*, Ex. A, Article IV(C).

Voyager alleges that it was not until March 20, 2023 that it learned the truth: namely, that

BAM commingled customer cryptocurrency with BAM's cryptocurrency in its existing wallet

infrastructure and that BAM did not intend to stop such commingling in the event Voyager were

to transfer assets to BAM.  Counterclaims (ECF No. 32) at ¶¶ 76-82.  Voyager urged BAM to

segregate the customer assets and argued that the "in trust" covenant required such segregation,

but BAM declined and said it would be "difficult if not impossible" to provide such a

segregation.  *Id*. at ¶¶ 83-84.  BAM assured Voyager that it would make a good faith effort to

address the issue, but it never offered a workable solution, and Voyager alleges that BAM's

assurances were just a ruse to drag out discussions until after a closing deadline had passed.  *Id*.

at ¶¶ 11-12, 85-86, 89, 97-98, 115.  BAM promised a new proposal but instead, on Tuesday,

April 25, 2023, BAM purported to terminate the APA on the ground that the deadline for the

completion of a closing had passed on April 18, 2023.  *Id.* at ¶ 98.  Voyager argued that the

termination was wrongful, and that BAM had breached and repudiated the "in trust" covenant

and its covenant to do what was necessary to comply with its obligations.  *Id*. at ¶¶ 99-100.

The First Counterclaim alleges that BAM wrongly terminated and repudiated the APA.  It

acknowledges that the APA contained an "Outside Date" of April 18, 2023, but it alleges that

under section 8.1(c) of the APA party did not have the right to terminate the agreement on that

ground if the failure to meet the Outside Date was caused by the party's own material breach of

its representations, warranties, covenants or agreements.  It further alleges that BAM breached
and repudiated the "in trust" covenant, its representation that it had full "power and authority"
and the infrastructure necessary to perform its obligations (including the segregation of trust
property from other assets), and its covenant that it would not take action that would prevent it
from performing its obligations.  Voyager contends that it was damaged by BAM's wrongful
termination and seeks damages of "at least $20 million," which was the minimum cash payment
that BAM was to have made if the deal had closed.  *Id.* at ¶¶ 103-119.

The Second Counterclaim alleges "fraud in the inducement."  It contends (a) that BAM
falsely represented that it intended to honor the "trust" covenant and to segregate customer
property from its own, (b) that BAM falsely represented that it had the "power" and
infrastructure necessary to do so, and (c) that BAM made false and materially misleading
statements and representations to the Court about its physical segregation of customer assets and
failed to correct them.  *Id.* at ¶¶ 120-140.  Voyager claims that it suffered damages "in the form
of the lost opportunity to pursue alternative transactions" and "in the form of administrative,
professional and legal expenses incurred in pursuing consummation of the APA and confirmation
of a Plan that included the APA – expenses that would have been avoided had BAM told the
truth."  *Id.* at ¶ 146.  Voyager disclaims any intent to seek "rescissory" damages and instead
represents that it "seeks to recover the losses it incurred as a result of BAM's fraudulent conduct
in an amount to be proved at trial."  *Id.*

The Third Counterclaim is pleaded in the alternative.  It alleges that even if the APA was
validly terminated Voyager has the right to retain a $10 million deposit as a "Reverse
Termination Fee" pursuant to section 8.3 of the APA (the terms of which are discussed more fully
below).  *Id.* at ¶¶ 147-157.

The Fourth Counterclaim also is pleaded in the alternative.  It alleges that even if the APA

was validly terminated Voyager would be entitled to retain BAM's $10 million deposit pursuant

to the terms of section 2.2(b) of the APA (described more fully below).  *Id*. at ¶¶ 158-171.

## BAM's Motion to Dismiss

BAM has moved to dismiss all of Voyager's counterclaims for failure to state a claim

upon which relief may be granted.  Fed. R. Bankr. P. 7012.  Most of BAM's ire is directed to the

Counterclaim that alleges that BAM committed fraud.  BAM contends: (a) that Voyager's fraud

claims are barred by Voyager's agreement, in the APA, that it had not relied on any

representations other than certain specific representations identified in the agreement; (b) that as

a matter of law the "power and authority" representation that BAM made cannot support a fraud

claim, and that in any event Delaware law does not permit a fraud claim or a fraudulent

inducement claim to be asserted based on representations made within a contract as opposed to

representations that are "external" to the contract; (c) that Delaware law does not permit a fraud

claim to be asserted based on a contention that a party made a contractual promise without

intending to perform it; (d) that Delaware law does not permit a "fraud in the inducement" claim

to be asserted based on statements made after the signing of a contract (such as the statements

made to this Court in the hearings that were held), and that BAM allegedly had no legal duty to

correct or to clarify those statements; and (e) that the "economic loss" doctrine bars Voyager's

claims that it incurred damages as the result of fraud.  BAM also contends that Voyager's three

contract-based counterclaims have not pleaded genuine claims for relief, and it contends that all

of Voyager's damage claims are subject to certain caps set forth in the APA.

## Discussion

The APA states that it is to be governed by Delaware law and so Delaware law governs

the contract-based Counterclaims.  The Counterclaims do not state clearly where the alleged

fraud claims accrued, though at least some allegedly misleading statements (including, for

example, those made in this Court) were made in New York.  In Delaware, the usual rule is that a

contractual choice of law provision also governs other aspects of parties' disputes, including

extra-contractual claims such as fraud claims.  *Abry P'rs V, L.P. v. F&W Acquisition LLC*, 891

A.2d 1032, 1046 (Del. Ch. 2006) (holding that choice of law provisions in contracts are meant to

provide certainty as to the rules that govern the parties' relationship and that permitting different

laws to govern tort claims would "create uncertainty of precisely the kind that the parties' choice

of law provision sought to avoid"); *Std. Gen. L.P. v. Charney*, No. 11287-CB, 2017 Del. Ch.

LEXIS 854, at *23-24 (Del. Ch. Dec. 19, 2017) (enforcing a choice of law provision that

reflected an intention that it would apply not only to contractual claims but also to  affirmative

defenses based on alleged fraud).  New York courts have held that a contractual choice of law

provision does not necessarily govern a fraud claim, but it will do so if the wording of the choice

of law provision is broad enough to encompass non-contractual matters.  *Krock v. Lipsay*, 97 F.3d

640, 645 (2d Cir. 1996); *Mayaguez S.A. v. Citigroup, Inc.*, No. 16-CV-6788, 2018 U.S. Dist.

LEXIS 51931, at *22-23 (S.D.N.Y. Mar. 28, 2018) (same); *Drenis v. Haligiannis*, 452 F. Supp.

2d 418, 425-26 (S.D.N.Y. 2006) (determining that under NY law, a choice of law provision in a

contract does not govern a tort claim "unless the express language of the choice-of-law provision

is sufficiently broad to encompass the entire relationship between the contracting parties").  The

choice of law provision in the APA states that "any Action that may be based upon, arising out of

or related to this Agreement or the negotiation, execution or performance of this Agreement or

the Transactions will be governed by and construed in accordance with" Delaware law.  APA, §

10.14.  The parties' agreement that Delaware law will govern all actions "related to . . . the

Transactions" is broad enough to cover extra-contractual claims, and the parties appear to agree

that all of Voyager's counterclaims (including its fraud claims) are governed by Delaware law.

In Delaware, a party who discovers fraud in connection with a contract must elect either

to rescind the transaction on account of such fraud or to stand on the contract and to seek

damages based on the alleged fraud.  *Prestancia Mgmt. Group v. Va. Heritage Found., II LLC*,

No. 1032-S, 2005 Del. Ch. LEXIS 80, at *18 n. 39 (Del. Ch. May 27, 2005) (holding that the two

remedies are inconsistent with each other and that an election is required).  As noted above,

Voyager has explicitly disclaimed any intention to seek rescission.  The issues discussed below

with respect to the fraud claims, therefore, have nothing to do with whether Voyager could seek

rescission, but instead concern only the question of whether Voyager may separately pursue

damage claims based on the alleged fraud.

I.      **The "Trust" Provisions in the APA and this Court's Orders**

BAM has devoted much of its papers to a discussion of whether section 6.12(a) of the

APA required an actual "express trust" and whether it required the physical segregation of

customer property from BAM's own property.  BAM has also challenged Voyager's

interpretation of the statements that were made to this Court and of the "trust" provisions that

were included in this Court's Orders.  In BAM's view, BAM never represented or promised

anything other than that it would keep general ledger records that tracked the amounts that it

owed to customers, and it contends that this Court's orders never required it to do more than that.

BAM argues that it is entitled, as a matter of law, to rulings in its favor on these points.  I

disagree.

13

There is an important history and context to be considered in addressing BAM's contentions. They are relevant to the contract issues that the parties have debated and to the Orders that I entered.

Voyager's bankruptcy filing, and the bankruptcy filing of Celsius Network LLC (also in 2022), raised legal issues regarding the extent to which cryptocurrencies in a customer's "account" with an exchange would be regarded as property owned by the customers or instead would just give rise to general unsecured claims by the customer against the exchange. *See, e.g., In re Voyager Digital Holdings, Inc.*, No. 22-10943 (MEW), 2022 Bankr. LEXIS 2178 (Bankr. S.D.N.Y. Aug. 5, 2022) (holding that customers owned certain cash deposits at a bank but that claims to recover cryptocurrencies credited to customer accounts were general unsecured claims); *In re Celsius Network LLC*, 647 B.R. 631, 660 (Bankr. S.D.N.Y. 2023) (resolving motions filed in 2022 and holding that under the terms of Celsius' customer agreements the customers only held general unsecured claims). Legal journals highlighted these issues, and also highlighted the risks that would exist if an exchange represented that it held assets for the benefit of customers but did not actually segregate customer assets from its other property. *See, e.g.,* Adam J. Levitin, *Not Your Keys, Not Your Coins: Unpriced Credit Risk in Cryptocurrency*, 101 Tex. L. Rev. 877, 893-894, 896, 940-41 (2023).[3]

The FTX collapse brought these risks into sharp focus. Section 8.2.6 of the FTX Trading Terms of Service, which was governed by English law, had informed FTX's customers that "[t]itle to your Digital Assets shall at all times remain with you and shall not transfer to FTX Trading . . . None of the Digital Assets in your Account are the property of, or shall or may be

---

[3]    Although the final version of this article was published in March 2023, earlier drafts were posted in 2022 and were publicly available at https://ssrn.com/abstract=4107019.

loaned to, FTX Trading; FTX Trading does not represent or treat Digital Assets in User's Accounts as belonging to FTX Trading." *See* Complaint, *Ad Hoc Committee of Non-US Customers of FTX.COM v. FTX Trading, Ltd., et al.,* Adv. Pro. No. 22-50514 (Bankr. D. Del. Dec. 28, 2022) (ECF No. 1), Ex. B.  In fact, it had become "widely reported" that FTX had commingled customer property with its own property and had regularly allowed customers' assets to be used by affiliates of FTX.  *Id.* at ¶ 4.  FTX's failures to segregate customer assets from its own assets led to the filing of an adversary proceeding in the Bankruptcy Court and also led to the filing of criminal and other regulatory charges against FTX and its principals.  More particularly:

- A criminal charge against Samuel Bankman-Fried, filed on December 9, 2022, alleged that he had falsely confirmed to various authorities that FTX segregated customer assets from its own property.  *See United States v. Bankman-Fried*, No. 22-cr. 673 (LAK) (S.D.N.Y. Dec. 9, 2022).

- On December 21, 2022, the Commodities Futures Trading Commission filed a complaint alleging that FTX's failures to segregate customer assets constituted fraud.  *See CFTC v. Bankman-Fried*, No. 22-cv-10503 (PKC) (S.D.N.Y. Dec. 13, 2022).  The CFTC alleged, among other things, that internal FTX memos showed an awareness of the need to segregate customer assets from FTX's own assets and that public statements by FTX had falsely represented that FTX segregated customer assets from its own assets.  *Id.,* Complaint at ¶¶ 50-54.

- The Securities and Exchange Commission similarly filed charges based on FTX's and its affiliates' failures to segregate customer assets.  *Securities and Exchange*

*Commission v. Samuel Bankman-Fried*, No. 22-cv-10501 (Dec. 13, 2022), Complaint

at ¶¶ 36, 49-50, 68.

It was in this context that Voyager's agreement with BAM was negotiated.  Section

6.12(e) of the APA provides:

> Notwithstanding anything to the contrary herein . . . Seller (prior to the Closing) and ***each User and Eligible Creditor (from and after the Closing) shall retain all right, title and interest in and to Coins allocated to it*** in accordance with this Agreement on the Binance.US Platform (notwithstanding any terms and conditions of the Binance.US Platform) through and including such time as such Coins are returned or distributed to Seller or such User and Eligible Creditor, as applicable, hereunder, ***and such Coins shall be held by Purchaser solely in a custodial capacity in trust and solely for the benefit of Seller or the applicable User or Eligible Creditor* . . .**"

BAM argues that that the mere fact that the word "trust" appears in section 6.12(e) does

not automatically mean that an "express trust" was required.  *See* Restatement (3d) of Trusts § 5

(2003) (use of the word "trust" does not necessarily mean that a trust relationship is involved).

This argument is of little help to BAM, because it is equally true that the intention to form an

express trust can be found even if the word "trust" is not used, so long as other indicia of intent

(for example, a statement that property will be held for the benefit of others) have been

manifested.  *See* Restatement (3d) of Trusts, § 13, cmt b (noting that '[n]o particular manner of

expression is necessary to manifest the trust intention" and that a trust may be created without

the use of the words "trust" or "trustee").  Even if (as BAM argues in is reply brief) some other

evidence is needed to determine the intent of the parties, that would just mean that a trial should

be held, rather than supporting BAM's request for a ruling in its favor as a matter of law.  BAM

Reply, ECF No. 35, p. 11-12.

Furthermore, section 6.12(e) of the APA does not merely use the word "trust" in isolation

from other terms, as BAM wrongly suggests that it does.  Section 6.12(e) says instead that assets

16

must be held by BAM "solely in a custodial capacity," "in trust" and "solely for the benefit of

Seller or the applicable User or Eligible Creditor."  It identifies the property that is to be held by

BAM; it identifies the parties who are to retain beneficial ownership of that property; it confirms

that BAM is to hold the property for the benefit of those persons; and it limits the rights of BAM

to use the property for any other purpose, stating that it is the held "solely" for the benefits of

others.  This language goes beyond the mere use of the word "trust" and is far more explicit than

the language used in the cases upon which BAM has relied.[4]  The language of the APA is more

than sufficient, particularly at the pleading stage, to support the contention that an express trust

was intended.  *See* Restatement (3d) of Trusts, § 13, cmt b (a trust arises from "a manifestation of

an intention to create that relationship and subjecting the person who holds title to the property to

duties to deal with it for the benefit of charity or for one or more persons, at least one of whom is

not the sole trustee").

      BAM also argues that a "trust," even if intended, would not have required a physical

segregation of "trust" assets from BAM's own assets.  This contention is simply wrong.  *See*

Restatement (3d) of Trusts § 84 (2012) (a trustee has a duty "to keep the trust property separate

from the trustee's own property"); *id.* cmt. b ("[a] trustee has a duty not to commingle property

of the trust with the trustee's own property"); *In re Heizer Corp.*, No. 7949, 1988 Del. Ch.

LEXIS 114, at *59 (Del. Ch. Jun. 6, 1988) (describing the commingling of trust assets with the

---

[4]    *See A.B. v. Wilmington Trust Co.*, 191 A.2d 98, 102 (Del. 1963) (where one provision in an
estate document stated that transfers would be made free of any trust, and a following
statement nevertheless said that property could be transferred "in trust" to certain parties, the
Court held that the provisions were in conflict with each other and that it was doubtful that
any actual trust was intended); *In re Morales Travel Agency*, 667 F.2d 1069, 1071 (1st Cir.
1981) (holding that a statement in IATA resolutions that travel agencies would hold amounts
in "trust" for airlines, without imposing any other obligations, was inadequate to establish an
express trust).

trustee's own assets as a serious breach of trust and as grounds for the removal of a trustee).  The

cases cited by BAM in support of its assertion that commingling is permissible merely stand for

the proposition that the beneficiaries of a trust may be able to pursue remedies notwithstanding a

wrongful commingling of assets, though they can do so only to the extent that they can trace

their own assets to property still held by the trustee.  None of those cited decisions stands for the

proposition that such a commingling is permissible in the first place, and several of them

expressly recognize that such a commingling is a breach of trust.  *See, e.g., Curran v. Smith-*

*Zollinger Co.*, 17 Del. Ch. 187, 188 (1930) (holding that a beneficiary could obtain some

recovery despite a commingling but only if assets could be traced); *In re Green Field Energy*

*Servs., Inc.,* 585 B.R. 89, 105 (Bankr. D. Del. 2018) (holding that a commingling of assets was

inconsistent with the requirements of the trust but that if such a commingling occurred the rights

of the beneficiary might still be enforced if the beneficiary could sustain its burden of tracing the

assets); *In re Dreier LLP,* 527 B.R. 126, 136 (S.D.N.Y. 2014) (holding that escrowed funds

should have been held in a separate account, though if that obligation was breached a party could

still obtain a recovery if it could trace the assets); *State ex rel. Ins. Comm'r of W.Va. v. Blue Cross*

*& Blue Shield of W. Va., Inc.,* 219 W.Va. 541, 551, 552 (W. Va. 2006) (confirming that a trustee

has a duty to keep trust property separate from the trustee's own assets but that upon a breach of

that obligation a recovery could still be had by a beneficiary if property could be traced).[5]

In an about-face, BAM also argues in its reply papers that section 6.12(e) should not be

considered to be a true "trust" obligation because the APA does not include an express bar

against commingling.  BAM Reply, p. 10.  This is a strange argument, given that BAM's primary

---

[5]   One other decision that BAM cited did not involve an express trust and just discussed
      "constructive trust" remedies for other wrongs.  *In re Drexel Burnham Lambert Grp., Inc.,*
      142 B.R. 633, 637 (S.D.N.Y. 1992).

contention is that an express "trust" obligation does not bar such a commingling in the first place. In any event, while it is true that the APA does not use the word "commingling," it does say that assets are to be "held" by BAM "solely in a custodial capacity," "in trust," and "solely" for the benefit of Voyager and Voyager's customers and creditors. Voyager contends that the obligation to avoid a commingling is inherent in these terms and in the requirement that property be held in trust. The language of section 6.12(e) certainly is sufficient to support Voyager's argument, and to preclude BAM's argument that as a matter of law no segregation of assets was required by the APA.

Voyager has not asked for a ruling on the meaning of section 6.12(e) as a matter of law, and so I will not make a definitive ruling at this time as to what section 6.12(e) required. I can, however, be much more definitive at this stage of the proceedings as to what my own court orders required.

Contrary to BAM's arguments, it was absolutely my intent to confirm (at the court hearings that were held) that BAM segregated customer assets from BAM's own assets. I was aware of the risks that customers faced in the absence of such a segregation and in the absence of an explicit trust arrangement. I had reviewed the legal journals that discussed those issues; I knew of the problems that had arisen in the FTX case; and I sought to obtain (and thought I had obtained) reliable and clear confirmations that BAM did not commingle customer assets with its own. The exchange during the January 10, 2023 sale hearing is summarized and partly quoted in the Counterclaims but the full text of the referenced portion of the transcript is set forth here:

> THE COURT: Okay. You – in that regard, obviously this case and other cases have highlighted the issue of just what rights customers have with respect to cryptocurrencies. Are they the general unsecured creditors? Is there rehypothecation? Is the exchange just a custodian? And if so, how is it effectuating that role?

What have you found in terms of your investigation of Binance as to what the Binance relationship is with customers and would be as to the Voyager customers?  Would that be a custody relationship or a different kind of relationship?

THE WITNESS:  I can speak to what I understand from a business perspective, which is that our understanding is that they act as a custodian for customers.  They do not view themselves as having, for example, title or ownership of customer crypto itself.

THE COURT:  And how is that custodial relationship effected in – through the wallet infrastructure that you said you investigated?  How is that done?"  Do they - - -

THE WITNESS:  Yes, Your Honor - -

THE COURT:  - - the customer assets?

THE WITNESS: I apologize, Your Honor.  I missed the last part of that question.

THE COURT:  Do they segregate all of the customer holdings from other holdings?

THE WITNESS: That's my understanding, Your Honor.

THE COURT:  Okay.  And what else did you learn in your due diligence about the wallet infrastructure at Binance?

THE WITNESS: Our understanding of their wallet infrastructure is that they use hot and cold wallets, whereby for example, parties are able to when they deposit funds onto the platform, those funds are deposited into hot wallets.  They use then customary and industry standards relating to the transfer and storage of those assets into cold storage.  Our understanding is that they use a TSS multi-sig approach for purposes of maintaining private keys, for example, relating to cold storage of those wallets.

You know, we view that and understand that to be an industry leading standard and based on our review of the financial statements and information that was provided to us, we do understand that they view those customer assets as being assets of the customers themselves directly.

THE COURT: And is that reflected in the Binance terms of use, to your knowledge?

THE WITNESS: That would be a legal determination, but my understanding is based on discussions with our counsel, that that's correct.

20

THE COURT: Can I just ask if the Binance – is this a good time, if the Binance counsel is on the phone, would you verify that that's how it works at Binance?

MR. GOLDBERG:  Your, Honor, this is Adam Goldberg of Lathan & Watkins on behalf of Binance.US.  Yes, Your Honor.  That's our understanding of how Binance terms of service operate.

THE COURT:  Okay.

THE WITNESS:  I would also note, Your Honor, in the APA itself, we also, you know, expressly included provisions to make sure even above and beyond those terms of service, that up until such customer has transferred the crypto, that we expressly call out custody and title of those cryptocurrencies.

THE COURT:  I have some questions, further questions about that that are probably for the lawyers, not for you as the witness, though.  You testified that you also asked or investigated the related party agreements and transactions.  What particularly did you look at and what did you learn?

THE WITNESS:  So Your Honor, our focus was on the relationship that Binance.US has with Binance.com.  Our understanding is that there are certain services agreements from a perpetual basis that they have in place with Binance.com.  We do also understand there to be common ownership interests through a common owner being CZ, but believe the business is based on the information that was provide to us to be separated from an operating perspective.

THE COURT:  And the cryptocurrency that's held in segregated wallets for customers, is that all held with Binance.US as the nominal owner?

THE WITNESS: Yes, based on the information that was provided to us, Your Honor.

THE COURT: But the understanding is I – as you said, that it's in a kind of trust custody relationship that it's a nominal owner but that the beneficial ownership belongs directly to the customers, right?

THE WITNESS: That's my understanding, Your Honor.

THE COURT:  And is any of the segregated customer cryptocurrency subject to the control or access of any of the other Binance companies?  Do they have access to the keys and they - - do they have any ability to transfer, anything of the kind?

THE WITNESS:  I am not aware, Your Honor of an ability for a Binance.com employee to be able to transfer cryptocurrency outside of the platform.

Jan. 10, 2023 Hr'g Tr. at 44:25-48:19 (ECF No. 864); Counterclaims, at ¶¶ 53-55.  BAM argues

that counsel's confirmation of the manner in which customer assets were held was only a

confirmation of the fact that "hot" and "cold" wallets were used, and not a confirmation of the

"segregation" of assets, but that is certainly not how I understood the answer at the time.

I also required, in the order that I entered that tentatively approved the APA (ECF No.

860) that any property that was to be transferred to BAM would be held "in trust" and solely in a

custodial capacity, with Voyager, its customers and its creditors retaining all beneficial rights to

the same.  I even asked whether it would be possible to segregate the Voyager assets from the

assets of other BAM customers but was informed that this would not be feasible.  *See* January

10, 2023 Transcript at 85:18-91:2 (ECF No. 864).  Contrary to BAM's current contentions, this

did *not* mean that BAM was entitled to commingle Voyager customer assets with BAM's own

assets.  It just meant that BAM could hold the Voyager customer property much the same way

that securities brokers and commodities brokers do (where customer property is separated from

company property but where the assets of different customers may be commingled).

The issue arose again in connection with the confirmation hearing.  On March 2, 2023, I

pointed out that the proposed "trust" restriction was to apply "through and including such time"

as the transferred cryptocurrencies either were returned to Voyager or were distributed to the

appropriate customer or other creditor, unless and until the relevant customer or other creditor

elected to become a customer of BAM, at which point those customers' and creditors' assets

would be held by BAM in those parties' new accounts at BAM.  I stated that the custodial/trust

relationship should continue in place for a sufficient time after the initial distributions were

made, so as to give customers a meaningful opportunity to make a withdrawal from a BAM

account without finding that they were just unsecured creditors of BAM.  *See* March 2, 2023

Hr'g Tr. at 199:2-12 (SDNY Case No. 1:23-cv-02171 (LTS), Docket No. 12-8).  When the

hearing resumed on March 6, 2023, counsel reported that over the prior weekend BAM and

Voyager had agreed that cryptocurrencies transferred to BAM would "always be held in trust" by

BAM and that the "trust" relationship with customers would be a permanent one.  March 6, 2023

Hr'g Tr. at 17:6-20 (ECF No. 1380).  Modifications were made to the Voyager plan of

reorganization to incorporate this change.  ECF No. 777.

        During the confirmation hearing, the United States Trustee objected to the proposed

inclusion of BAM as a beneficiary of certain "exculpation" provisions, and argued that such

provisions should only be provided for parties who were estate fiduciaries.  I noted that under the

proposed plan of reorganization BAM would be a distribution agent for Voyager and its creditors

and would hold and distribute assets "in trust," and therefore BAM would be a fiduciary.  ECF

1380 at 197:24-198:2.  Mr. Renzi also confirmed, during his testimony at a later stage of the

confirmation hearing, that BAM had represented that it segregates customer cryptocurrencies

from BAM's own cryptocurrencies.  SDNY Case No. 1:23-cv-02171 (LTS), Docket No. 12-8 at

212:19-213:7.

        I summarized the "trust" arrangements that were being put in place in the Decision that I

entered following the confirmation hearing.  ECF No. 1170 at 17-21, 23, *Decision Regarding (1)*

*Approval Of The Debtors' Disclosure Statement, (2) Confirmation Of The Debtors' Plan Of*

*Reorganization, (3) Motions Seeking The Appointment Of A Trustee, (4) Motions Requesting Full*

*Customer Access to Account Holdings, and (5) Related Matters*.  The confirmation order that I

entered (ECF 1166) also confirmed that, "notwithstanding" any contrary provisions in the terms

and conditions that normally governed the use of the BAM platform, the transferred

cryptocurrencies were to be held by BAM "solely in a custodial capacity in trust and solely for

the benefit of Seller or the applicable User or Eligible Creditor thereafter." *Id*. ¶ 56.  As noted above, the "trust" arrangement also was set forth in the confirmed plan of reorganization.

BAM argues that the APA did not require an express trust and that my Orders did not and could not alter the terms of the APA.  It is more accurate to say that Voyager's agreement with BAM was effective only to the extent that I approved it under section 363 of the Bankruptcy Code.  *See* 11 U.S.C. § 363(b).  To put it another way: the approved transactions could only have proceeded in accordance with my Orders.  Those Orders were explicit in saying that assets could only be transferred to BAM "in trust," "solely in a custodial capacity" and "solely" for the benefits of Voyager, Voyager's customers and Voyager's creditors, and that all "beneficial title" was to remain with Voyager, Voyager's customers and Voyager's creditors.  My Order approving the APA (ECF No. 860) made clear that this obligation applied "[n]otwithstanding anything to the contrary in this Order or in the [APA]." *Id.,* ¶ 14.  Those words were not chosen by the parties; they were chosen by me, and I need no further evidence to know what I meant when I said that assets were to be held "in trust."  I meant what the words clearly said.

## II.    Voyager's Fraud Claim

Voyager's fraud claim appears to have four separate bases, though the parties' arguments often blur them or combine them.  Voyager alleges (a) that BAM falsely represented and warranted that it had the "power and authority" to perform its trust obligations; (b) that BAM committed fraud by making a promise (that assets would be held in "trust") that BAM had no intent to honor; (c) that BAM's representatives made false and/or misleading statements before this Court in January and March, 2023 as to whether BAM segregated customer assets from its own assets, without later correcting those statements; and (d) that BAM submitted an Officer's Certificate in March 2023 that was false and/or misleading as to whether, and how, a

"segregation" of customer assets was in place.  At some points Voyager argues as though the statements made in Court, and in the Officer's Certificate, are primarily just evidence of fraudulent intent, while at other times Voyager suggests that they are separate grounds for a fraud claim.  ECF No. 33 at 28-30.

Sorting out the extent to which Delaware law permits Voyager to assert fraud claims in addition to its breach of contract claims is not so straightforward a task as one might hope.  One Delaware decision acknowledged that calling the Delaware case law in these areas "muddled" or "all over the place" may "understate the point."  *Levy Fam. Investors, LLC v. Oars + Alps LLC*, C.A. No. 2021-0129 (JRS), 2022 Del. Ch. LEXIS 20, at *17-18 (Del. Ch. Jan. 27, 2022).  But I believe the prevailing rules that can be identified from a close review of the decisions, as explained below.

A.    **The Enforceability of the Disclaimer in Section 4.10 of the APA**

Voyager agreed in section 4.10 of the APA that it had not and would not rely on any express or implied representations other than certain "Express Purchaser Representations."  APA, § 4.10.  More particularly, section 4.10 stated:

>    Except for the representations and warranties expressly contained in this Article IV (as qualified by the Schedules and in accordance with the express terms and conditions (including limitations and exclusions) of this Agreement) or in the certificate to be delivered pursuant to Section 2.5(d) (the "Express Purchaser Representations") (it being understood that Seller has relied only on the Express Purchaser Representations), Seller acknowledges and agrees that neither Purchaser nor any other Person on behalf of Purchaser makes, and Seller has not relied on, is not relying on, and will not rely on the accuracy or completeness of any express or implied representation or warranty with respect to Purchaser or with respect to any information, statements, disclosures, documents, projections, forecasts or other material of any nature made available or provided by any Person to Seller or any of its Affiliates or their respective advisors on behalf of Purchaser.  Without limiting the generality of the foregoing, except for the Express Purchaser Representations, neither Purchaser nor any other Person will have or be subject to any Liability whatsoever to Seller, or any other

> Person, resulting from the distribution to Seller, its Affiliates or their
> respective Advisors, or Seller's its Affiliates' or their respective Advisors' use
> of or reliance on, any such information, statements, disclosures, documents,
> projections, forecasts or other material made available to them in expectation
> of the Transactions or any discussions with respect to any of the foregoing
> information.

*Id.*  The term "Express Purchaser Representations" included the express representations and

warranties in Article IV of the APA and those to be included in the certificates that were to be

delivered at closing pursuant to section 2.5(d) of the APA.  *Id.*, § 4.10.  Voyager also agreed,

"[n]otwithstanding" any other provision in the contract, that the Express Purchaser

Representations "are the sole and exclusive representations, warranties and statements of any

kind made to Seller and on which Seller may rely in connection with the Transactions" and that

all other representations (express or implied) were disclaimed by BAM.  *Id.* § 3.18.

Section 10.21 of the APA contains a partial limit on the scope of these disclaimers.

Section 10.21 states:

> Notwithstanding anything in this Agreement to the contrary (including . . .
> Section 3.18 [and] Section 4.10 . . . nothing herein shall relieve any Person
> from any Liability on account of Fraud.

APA, § 10.21.  The APA defines "Fraud" for this purpose as follows:

> "Fraud" means an act committed by . . . Purchaser, ***in the making to Seller
> of the Express Purchaser Representations*** . . . with intent to (x) deceive the
> other Party or (y) induce such other party hereto to enter into this Agreement .
> . . which together constitutes common law fraud under Delaware Law (and
> does not include any fraud claim based on constructive knowledge, negligent
> misrepresentation, recklessness or a similar theory).

*Id.* at  Article XI, § 11.1(nn) (emphasis added).  The limitation in section 10.21 therefore applies

only to fraud claims that are based on the "making" of the "Express Purchaser Representations."

Delaware courts have usually enforced disclaimers of the kind quoted above and have

relied on such disclaimers to dismiss fraud claims.  *See RAA Mgmt, LLC v. Savage Sports

Holdings, Inc.*, 45 A.3d 107, 118-19 (Del. 2012) (noting the policy under both Delaware and

New York law to enforce contractually binding written disclaimers of reliance); *Pilot Air Freight,*

*LLC v. Manna Freight Sys.*, No. 2019-0992-JRS, 2020 Del. Ch. LEXIS 291, at *46-47 (Del. Ch.

Sept. 18, 2020) (enforcing an "unambiguous" mutual covenant that the parties did not rely on

extra-contractual promises or statements); *ITW Global Invs. v. Am. Indus. Partners Capital Fund*

*IV, L.P.*, No. N14C-10-236 JRJ CCLD, 2015 Del. Super. LEXIS 320, at *22-23 (Del. Super. Jun.

24, 2015) (holding that Delaware courts enforce contractual non-reliance clauses to bar fraud

claims).  Delaware courts have enforced such disclaimers even as to alleged fraudulent

statements that are made after the disclaimer has been executed, so long as the disclaimer

amounts to an express promise not to rely on such matters.  *See Universal Am. Corp. v. Partners*

*Healthcare Solutions Holdings, L.P.*, 176 F. Supp. 3d 387, 402 (D. Del. 2016) (enforcing an

agreement that parties would rely solely on certain matters and barring a fraud claim based on

statements made after the execution of a contract and before closing).

Voyager argues that it is against Delaware public policy to enforce contractual

disclaimers to the extent they purport to limit remedies for fraud, citing the decision in *Abry*

*Partners V, L.P. v. F&W Acquisition LLC*, 891 A.2d 1032 (Del. Ch. 2006).  At least one Delaware

court decision appears to agree with this reasoning.  *See Overdrive, Inc. v. Baker & Taylor, Inc.*,

No. Civ. A. 5835-CC, 2011 Del. Ch. LEXIS 91, at *21-22 (Del. Ch. June 17, 2011) (citing *Abry*

and holding that it would be contrary to public policy to enforce an anti-reliance clause where

alleged pre-contract misrepresentations related directly to the accuracy of representations made

within a contract and would have frustrated the very purpose of the contract).  I believe, though,

that the Debtor's argument, and the *Overdrive* decision, misinterpret the holdings in *Abry.*

In *Abry*, a party disclaimed reliance on any representations that were not included in the

contract itself.  891 A.2d  at 1034-1035.  The *Abry* decision held that this disclaimer was

permissible and enforceable.  *Id.* at 1057-1059 (observing that "a party cannot promise . . . that it

will not rely on promises and representations outside of the agreement and then shirk its own

bargain in favor of a 'but we did rely on those other representations' fraudulent inducement

claim").  The court explained the policies behind its ruling as follows:

> To fail to enforce non-reliance clauses is not to promote a public policy against lying.  Rather, it is to excuse a lie made by one contracting party in writing -- the lie that it was relying only on contractual representations and that no other representations had been made -- to enable it to prove that another party lied orally or in a writing outside the contract's four corners.  For the plaintiff in such a situation to prove its fraudulent inducement claim, it proves itself not only a liar, but a liar in the most inexcusable of commercial circumstances: in a freely negotiated written contract.  Put colloquially, this is necessarily a "Double Liar" scenario.  To allow the buyer to prevail on its claim is to sanction its own fraudulent conduct.

> The enforcement of non-reliance clauses recognizes that parties with free will should say no rather than lie in a contract.  The enforcement of non-reliance clauses also recognizes another reality that is often overlooked in morally-tinged ruminations on the importance of deterring fraud.  That reality is that courts are not perfect in distinguishing meritorious from non-meritorious claims of fraud.  Permitting the procession of fraud claims based on statements that buyers promised they did not rely upon subjects sellers to a greater possibility of wrongful liability, especially because those statements are often allegedly oral, rather than in a writing, and thus there is often an evidentiary issue about whether the supposedly false statement ever was uttered.  As important, even when a court rejects a buyer's fraud claim that is grounded in a disclaimed statement, the seller does not get the full benefit of its bargain because the costs (both direct and indirect) of the litigation are rarely shifted in America to the buyer who made a meritless claim.

> For these and other reasons explained in our decisions, this court has therefore honored contracts that define those representations of fact that formed the reality upon which the parties premised their decision to bargain.  This sort of definition minimizes the risk of erroneous litigation outcomes by reducing doubts about what was promised and said, especially because the contracting parties have defined that in writing in their contract.

*Id.* at 1058.  The court held that the mere use of a merger or integration clause does not suffice to

bar a fraud claim, but that a clear statement of non-reliance on matters other than particular

matters identified in a contract is enforceable.  *Id.* at 1058-59.

The *Abry* decision also held that it would be contrary to Delaware public policy to limit the remedies that a party may seek with respect to a fraud claim that is *not* barred by such a contractual disclaimer.  The contract in the *Abry* case did not disclaim reliance on representations that were set forth in the contract itself, but it did purport to limit the remedies that the plaintiff could pursue for such a fraud and allegedly barred the plaintiff from seeking rescission.  The *Abry* decision described the issue that this provision raised as one of whether the parties could premise a contract on defined representations but nevertheless could "promise in advance to accept a less-than-adequate remedy if one of them has been induced by lies about one of those material facts."  *Id.* at 1062.  The court held that so long as the plaintiff could show that it was entitled to rely on a contractual representation or warranty, and so long as the plaintiff could show that (a) the seller knew that a contractual representation made by another party was false, or (b) that the seller itself had lied about the contractual representation and warranty, a contractual limit on the plaintiff's remedies for fraud would violate public policy.  *Id*.

I do not believe that the *Abry* decision stands for the general proposition that contractual disclaimers may be disregarded whenever the alleged fraudulent acts by a contracting party were intentional, as Voyager suggests and as the *Overdrive* decision appeared to hold.  The comments about public policy in *Abry* related to the limitations on the remedies that could be pursued in circumstances where fraud claims were not barred by contractual non-reliance provisions.  *Abry* did not suggest any public policy limits to the enforcement of such non-reliance provisions in the first instance, at least to the extent that such non-reliance agreements are made by commercially sophisticated parties.  *See, e.g., New Enter. Assocs. 14 v. Rich*, 295 A.3d 520, 592 (Del. Ch. 2023) ("Technically, the *Abry Partners* decision does not limit liability for fraud, but rather specifies the information on which a fraud claim can be based, which indirectly constrains liability for

fraud"); *FdG Logistics LLC v. A&R Logistics Holdings, Inc.,* 131 A.3d 842, 859-60 (Del. Ch.

2016) (noting that the *Abry* court upheld the enforcement of a buyer's agreement as to what it

had relied upon); *Wildfire Credit Union v. Fiserv, Inc.*, No. 14-cv-14359, 2015 U.S. Dist. LEXIS

195053, at *12  (E.D. Mich. Aug. 10, 2015) (holding that *Abry* enforced the contractual

disclaimer that was at issue).

The extent to which the disclaimer in the APA bars the various parts of Voyager's fraud

claims is discussed further below.

### B.    Whether the "Power and Authority" Representation Supports a Fraud Claim

Voyager alleges that BAM falsely represented that it had the "power and authority" to

"perform" its obligations, including its obligation to hold assets "in trust" for Voyager and

Voyager's customers and creditors.  Voyager further alleges that BAM later revealed that it did

not have the ability to segregate customer assets, and that BAM knew this fact at the time it

made the representation in the APA.

BAM's representation that it had the "power and authority" to perform its obligations is

one of the "Express Purchaser Representations" upon which Voyager was entitled to rely and for

which a fraud claim is permitted under section 10.21 of the APA.  The disclaimer in section 4.10

therefore does not bar a fraud claim based on the "power and authority" representation.

BAM asserts that Delaware law does not permit a party to assert a fraud claim based on a

representation that is contained within a contract.  This contention is simply wrong.  Many

Delaware courts have held that a fraud claim may be asserted based on misrepresentations that

are found in a contract, so long as the allegations of fraud do not merely allege in a conclusory

way that a party failed to perform a contractual duty and so long as damages are alleged that are

separate from the asserted contract damages.  *See, e.g., Levy Fam. Investors, LLC v. Oars + Alps*

30

*LLC*, 2022 Del. Ch. LEXIS 20, at *19  ("A rule that would limit a plaintiff's recovery for so-called 'contractual fraud' solely on the ground that the same conduct also constitutes a breach of contract would offend Delaware public policy and the now-settled Delaware law regarding 'contractual fraud' that is animated, in part, by those policy concerns"); *In re Bracket Holding Corp. Litig.*, Consol. C.A. No. N15C-02-233 (WCC), 2017 Del. Super. LEXIS 377 (Del. Super. Ct. July 31, 2017) (holding that parties may assert fraud claims based on representations made in a contract, but if the action is based solely on a party's failure to perform the contract, with no separate damages, a fraud claim is improper); *Grunstein v. Silva*, C.A. No. 3932 (VCN), 2009 Del. Ch. LEXIS 206 (Del. Ch. Dec. 8, 2009) (permitting fraud claims based on contract representations); *ITW Global Invs. v. Am. Indus. Partners Capital Fund IV, L.P.*, C.A. No. N14C-10-236 (JRJ), 2015 Del. Super. LEXIS 320 (Del. Super. Ct. 2015) (allowing a fraud claim based on false representations as to the accuracy of financial statements).

BAM points to the fact that Voyager labeled its fraud counterclaim as a claim of "fraudulent inducement," and argues that conduct that allegedly "induces" a contract must precede the execution of the contract and must be independent of the contract itself.  In support of that proposition BAM relies primarily on a Delaware decision that applied Florida law, not Delaware law.  *See Furnari v. Wallpang, Inc.*, C.A. No. 13C-04-287 (JRJ), 2014 Del. Super. LEXIS 199 (Del. Super. Ct. Jul. 1, 2013) (applying Florida law, and holding that plaintiff alleged misrepresentations within a letter agreement but did not allege fraud that preceded the execution of the letter agreement).  We have found a number of instances in which Delaware courts have allowed claims that parties were fraudulently "induced" to execute contracts based on representations that were set forth in the contracts themselves.  *See Abry*, 891 A.2d at 1051 (noting that fraudulent representations about the accuracy of financial statements were included

in a contract and were intended 'to induce the Buyer to sign the Agreement and close the sale to

purchase the Company"); *Agspring Holdco, LLC v. NGP X US Holdings, L.P.*, C.A. No. 2019-

0567 (AGB), 2020 Del. Ch. LEXIS 252, at *32 (Del. Ch. July 30, 2020) ("This court's

precedents recognize that a buyer may sue for fraud based on false representations in a contract

that induce the buyer to enter into the contract"); *H-M Wexford LLC*, 832 A.2d at 145 (upholding

a claim of fraudulent inducement based on false representations made in a contract). This

approach makes abundant sense. Parties know what is in a contract before they sign it, so it

would be absurd to hold that fraudulent representations in a contract could not have "induced"

the execution of that contract.

I also do not think the label of Voyager's claim is important or should be dispositive

under Delaware law. The elements of a "fraudulent inducement" claim and the elements of a

general "fraud" claim in Delaware are the same. *See In re P3 Health Group Holdings, LLC*,

Consol. C.A. No. 2021-0518 (JTL), 2022 Del. Ch. LEXIS 471, at *7-8 (Del. Ch. Oct. 28, 2022)

(holding that "Delaware law does not distinguish between a claim for fraudulent inducement and

a claim for common law fraud" and that the elements are the same). The label that Voyager has

used in its Counterclaims should make no difference.

BAM contends that as a matter of law the "power and authority" representation merely

was a formal statement of BAM's corporate authority to enter into the APA. That argument is

not consistent with the language of the relevant provision. BAM did not merely state that its

representatives had the corporate authority to sign the APA on behalf of BAM. Instead, BAM

represented that it had the "power" to "perform" its obligations under the APA, which included

the "trust" obligations. *See Fortis Advisors LLC v. Stora Enso AB*, C.A. No. 12291 (VCS), 2018

Del. Ch. LEXIS 272, at *9-10 (Del. Ch. Aug. 10, 2018) (*citing* Lou R. Kling, Eileen T. Nugent &

Brandon A. Van Dyke, *Negotiated Acquisitions of Companies, Subsidiaries and Divisions* § 11.04[6] (1992)(2018 update) (explaining the different iterations of "power and authority" representations and stating that "whether such nuances in language have any meaningful effect will vary from case to case.")).  A false representation as to a party's ability to perform supports a fraud claim in Delaware. *Alltrista Plastics, LLC v. Rockline Indus.*, No. N12C-09-094 JTV, 2013 Del. Super. LEXIS 402, at *38 (Del. Super. Sept. 4, 2013) (holding that an allegation that a party misrepresented its ability to perform supported a fraud claim).  In arguing the contrary, BAM relies on decisions that did not allege any actual inability to perform and that therefore did not allege that a party's representation about its "power" to perform was false in any way. *See WNYH, LLC v. AccuMED Corp.*, C.A. No. 2017-0610 (SG), 2018 Del. Ch. LEXIS 173, at *22-23 (Del. Ch. May 31, 2018) (holding that a representation of a party's power and authority to buy assets was not violated where there was no allegation that the company did not have the ability to do so); *In re Mount 2012 Irrevocable Dynasty Trust U/A/D Dec. 5, 2012,* C. A. No. 12892-VCS, 2017 Del. Ch. LEXIS 295, at *15, n. 30 (Del. Ch. Sept. 7., 2017) (determining that a representation that a party had "full power and authority to enter into this Settlement Agreement . . . and to carry out [their] obligations hereunder and thereunder" was not a "separate and distinct promise to perform the obligations imposed" by the contract and did not give rise to a claim in the absence of an allegation that the party lacked the ability to perform.)

BAM further argues that the Counterclaims merely allege that it would have been impracticable for BAM to segregate customer assets, and that a representation about a party's "power" to perform its obligations is not a representation that it will be "practicable" for a party to do so.  ECF No. 24 at 20.  The Counterclaims actually allege that BAM disclosed that it would be "difficult if not impossible" to segregate assets, or that it would be "'impossible' or at least

impracticable." Counterclaims, ¶¶ 8, 9, 84, 121, 141. Proof that segregation was required but that it was "impossible" for BAM to comply with that obligation would go directly to the truth of BAM's representation that it had the "power" to perform its obligations. Voyager also may be able to show at trial that it was materially misleading for BAM to make an unqualified representation that it had the "power" to perform its obligations if, at the time, BAM knew that it would be "impracticable" for BAM to do so. *See Brighthouse Life Ins. Co. v. Geronta Funding*, 2019 Del. Super. LEXIS 681 (Del. Super. Aug. 7, 2019) ("A statement that is partial or incomplete may be a misrepresentation because it is misleading, when it purports to tell the whole truth and does not.")

Voyager will need to prove, at trial, that BAM intentionally made a false representation and that Voyager incurred damages that are different from the breach of contract damages that it seeks, but at this stage I cannot say that the fraud claim should be dismissed.

### C.    The Alleged Making of a Promise With No Intent to Perform

Voyager alleges that BAM promised to hold customer assets in trust but that BAM did not intend to do so at the time it made that promise. BAM argues that any breach or repudiation of the "trust" covenant would just constitute a breach of contract, and that Delaware law does not permit a fraud claim to be asserted based on an alleged lack of intent to perform. The law on this particular subject differs from state to state – and quite frankly, often differs somewhat in different court decisions within a state.

The Restatement of Contracts states that "[i]t is ordinarily reasonable for the promisee to infer from the making of a promise that the promisor intends to perform it" and that if "the promise is made with the intention of not performing it, this implied assertion is false and is a misrepresentation." Restatement (Second) of Contracts, § 171, cmt. b. The Restatement

suggests that the mere failure to perform is not enough to show an intent not to perform but opines that "the probable inability of a party, at the time the contract is made, to perform it, for instance the insolvency of one who buys land, is evidence bearing on the question of intent not to perform." *Id.* The Restatement of Torts similarly recognizes that the making of a contractual promise when the promisor has no actual intent to perform the obligation can give rise to a fraud claim. Restatement (Second) of Torts, § 530.

Whether the Delaware courts agree with the Restatements is not so clear. There are many Delaware cases that have held that a breach of contract claim cannot be "bootstrapped" into a fraud claim just by adding a conclusory allegation that the promisor had no intent to perform the promise at the time it was made. *See, e.g., Smash Franchise P'rs, LLC v. Kanda Hldgs., Inc.*, C.A. No. 2020-0302 (JTL), 2020 Del. Ch. LEXIS 263, at *47 (Del. Ch. Aug. 13, 2020) ("[a] 'bootstrapped' claim thus takes the simple fact of nonperformance, adds a dollop of the counterparty's subjective intent not to perform, and claims fraud" and thereby "attempts to take a straightforward claim for breach of contract and convert it into a fraud claim"); *Anschutz Corp. v. Brown Robin Cap., LLC*, C.A. No. 2019-0710 (JRS), 2020 Del. Ch. LEXIS 212, at *38 (Del. Ch. Jun. 11, 2020) (holding that a plaintiff cannot state a claim for fraud simply by adding the words "fraudulently induced" to a complaint or alleging that the defendant never intended to comply with the agreement).[6] BAM suggests that these decisions are based on the view that a

---

[6]    *See also MHS Capital, LLC v. Goggin*, No. 2017-0449-SG, 2018 Del. Ch. LEXIS 151 *28 (Del. Ch. May 10, 2018) (a party cannot "bootstrap" a claim of breach of contract into a claim of fraud merely by intoning the *prima facie* elements of the tort in connection with the defendant's failure to perform under the contract); *Cornell Glasgow, LLC v. LA Grange Props., LLC*, No. N11C-05-016 JRS CCLD, 2012 Del. Super. LEXIS 266, at *24, 27-29 (Del. Super. Jun. 6, 2012) (claim was based on defendant's failures to perform, and allegations that defendants did not intend to perform were not sufficient to convert the claim to a fraud claim); *Microstrategy Inc. v. Acacia Research Corp.*, No. 5735-VCP, 2010 Del.

"covenant" is just a future promise (not a representation of fact), and that an insincere promise

cannot be treated as a false statement of fact upon which a fraud claim can be based.  Two of the

primary decisions upon which BAM relies for this proposition were decided under New York

law, not Delaware law.  *See Mitsubishi Power Sys. Ams., Inc. v. Babcock & Brown Infrastructure*

*Grp. US, LLC*, No. 4499-VCL, 2010 Del. Ch. LEXIS 11, at *47 (Del. Ch. Jan. 22, 2010); *Iotex*

*Communs, Inc. v. Defries*, Consol. C.A. No. 15817 (SPL), No. 15817, 1998 Del. Ch. LEXIS 236,

at *18 (Del. Ch. Dec. 21, 1998).  However, at least one Delaware decision, decided under

Delaware law, has held that an insincere promise cannot be treated as a representation of fact that

supports a claim of fraud.  *See, e.g., Gea Sys. N. Am. LLC v. Golden State Foods Corp.*, No. 18C-

11-242 EMD CCLD, 2020 Del. Super. LEXIS 282, at *24 (Del. Super. June 8, 2020) (holding

that an alleged promise to repair was a mere promise and not a misrepresentation of fact.)

    Other Delaware decisions suggest that a different and much more nuanced approach is

required.  Some Delaware decisions hold that the "bootstrapping" rule applies where the

allegation of an intent not to perform is just a "conclusory" label that is tacked onto a breach of

contract claim, as though the primary concern were with the specificity of the pleading.  *See,*

*e.g., Beyond Risk Topco Holdings, L.P. v. Chandler*, C.A. No. N24C-01-221 (EMD), 2024 Del.

Super. LEXIS 674, at *49-51 (Del. Super. Sept. 24, 2024) (citing to the bootstrapping doctrine

and finding it applicable where allegations of fraud were conclusory and did not have the

particularity required by Delaware pleading rules); *Yangaroo Inc. v. Digit. Media Servs.*, C.A.

---

Ch. LEXIS 254, at *70-71 (Del. Ch. Dec. 30, 2010)(party cannot plead a fraud claim merely
by alleging that a contracting party never intended to perform its obligations); *BAE Sys. N.
Am. Inc. v. Lockheed Martin Corp.*, No. 20456, 2004 Del. Ch. LEXIS 119, at *34-35 (Del.
Ch. Aug. 3, 2004) ("[c]ouching an alleged failure to comply with the Transaction Agreement
as a failure to disclose an intention to take certain actions arguably inconsistent with that
agreement is exactly the kind of bootstrapping this Court will not entertain.")

No. N23C-06-090 (EMD), 2024 Del. Super. LEXIS 430, at *23-24 (Del. Super. May 30, 2024)

(describing the "bootstrapping" doctrine as a pleading rule and confirming that a fraud claim is

not properly asserted when the only damages sought are for breach of contract, but holding that

the anti-bootstrapping doctrine does not apply where a plaintiff has made particularized

allegations that a seller knew contractual representations were false or where damages for fraud

may be different from contract damages).  Accordingly, a barebones allegation that a promise

was fraudulently made is not sufficient, but a fraud claim can be asserted "if particularized facts

are alleged that collectively allow the inference that, at the time the promise was made, the

speaker had no intention of performing." *Grunstein v. Silva,* 2009 Del. Ch. LEXIS at *45-46;

*see also CSH Theatres, LLC v. Nederlander of San Francisco Associates,* No. 9380 (VCP), 2015

Del. Ch. LEXIS 115, at *54-55 (Del. Ch. Apr. 21, 2015) (holding that Delaware courts apply a

demanding pleading test for claims regarding false statements of intent but that such claims are

permitted if the plaintiff pleads specific facts that lead to a reasonable inference that the promisor

had no intention of performing at the time the promise was made); *Narrowstep, Inc. v. Onstream

Media Corp.*, C.A. No. 5114 (VCP), 2010 Del. Ch. LEXIS 250, at *51-53 (Del. Ch. Dec. 22,

2010) (citing the general rule against bootstrapping but holding that specific allegations of

repeated false assurances of an intention to close a merger, made with the intent to plunder the

assets of the other party by "stringing it along under the guise of working toward an expeditious

closing," sufficed to state a fraud claim); *Reserves Dev. LLC v. Crystal Props., LLC*, C.A. No.

05C-11-011 (RFS), 2009 Del. Super. LEXIS 198, at *25 (Del. Super. May 18, 2009) (holding

that a contractual promise made with the undisclosed intention of not performing it is fraud

under Delaware law).  Still other Delaware decisions suggest that the "bootstrapping" prohibition

may not apply at all where there are allegations that damages were incurred as the result of fraud

that would not be coextensive with damages for breach of contract.  *See Swipe Acquisition Corp. v. Krauss*, C.A. No. 2019-0509 (PAF), 2020 Del. Ch. LEXIS 276, at *26-27 (Del. Ch. May 5, 2020) (the anti-bootstrapping rule does not apply if there are particularized allegations of fraud "or where damages for plaintiff's fraud claim may be different from plaintiff's breach of contract claim.")

I cannot agree with BAM's characterization of Delaware law given the many Delaware decisions that have permitted fraud claims to be asserted based on allegations that a party did not intend to perform its obligations, so long as the allegations are not merely conclusory and so long as the damage claims are not just replicas of the contract damage claims.  Those Delaware decisions appear to represent the prevailing view in the recent Delaware case law.  In this case, Voyager's fraud counterclaim does not merely attach a conclusory "fraud" label to a breach of contract claim.  The Counterclaims allege circumstances that (if true) would support a finding that BAM did not actually intend to perform the "trust" obligation when it agreed to do so, and that BAM made a false promise in order to get access to Voyager's and its customers' assets.

The bigger issue is whether this particular fraud claim is barred by the disclaimer in section 4.10 of the APA.  The Restatement of Contracts states that the theory of this particular claim is that the making of a promise constitutes an "implied" representation that the promisor intends to honor it.  Restatement (Second) of Contracts, § 171, cmt. b.  Section 4.10 disclaims reliance on any such "implied" representations, and as discussed above such disclaimers are enforceable in Delaware.  Evidence that BAM knew it could not and would not segregate customer assets (and therefore that never intended to perform its alleged obligation to do so) may still be relevant in assessing whether BAM's representation that it had the "power and authority" to "perform" its obligations was false or materially misleading.  However, any stand-alone claim

that Voyager relied on an "implied" representation as to BAM's intent to perform would be

barred by the disclaimer in section 4.10.

    **D.**    **In-Court Statements and BAM's Officer's Certificate.**

    BAM argued in its papers that the statements that were made in response to this Court's

questions at the sale hearing and at the later confirmation hearing, and the statements that were

made in the Officer's Certificate that BAM filed, were statements that were made after the APA

was signed and that such statements cannot support a "fraud in the inducement" claim.  ECF No.

35 at 10, 12, 25, 33, 37.  There are Delaware decisions that have held generally that the

representations upon which a fraudulent inducement claim is made must have been made on or

before the date on which a contract is executed.  *See Pivotal Payments Direct Corp. v. Planet

Payment, Inc.*, C.A. No. N15C-02-059 (EMD), 2015 Del. Super. LEXIS 1058, at *9 (Del. Super.

Dec 29, 2015) (discussing the date on which a claim of fraudulent inducement accrues for

purposes of the statute of limitations).  As explained above, I do not think that the label of a

claim as a "fraud in the inducement" claim, rather than as a "fraud" claim generally, should be

controlling.  Regardless of what nuances may apply in distinguishing "fraud in the inducement"

claims from other "fraud" claims, it appears that Delaware courts have not categorically barred

all "fraud" claims that are based on statements that are made after a contract is executed, unless

(as discussed above) an explicit disclaimer agreement bars such claims.  *See Narrowstep, Inc.*,

2010 Del. Ch. LEXIS 250, at *53 (permitting a fraud claim based, at least in part, on statements

made to string the other party along and thereby perpetrating an alleged scheme to plunder

assets); *Trust Robin, Inc. v. Tissue Analytics, Inc.*, C.A. No. 2021-0806-SG, 2022 Del. Ch.

LEXIS 350, at *11-12 (Del. Ch. December 2, 2022) (finding fraud allegations sufficient based,

among other things, on allegations that the defendant made false representations of its intentions upon which plaintiff relied to "remain in a contractual relationship").

The circumstances of this case also warrant a different rule than the one that BAM suggested in its papers. In a normal case, outside of bankruptcy, a contract is effective when it is signed. In bankruptcy, the rule differs: contracts that are outside the ordinary course of the Debtor's business are not effective and are not enforceable unless and until the Bankruptcy Court authorizes them. *See* 11 U.S.C. § 363. At the hearing on this motion, I asked BAM's counsel whether under these circumstances statements that were made to induce Voyager to obtain the necessary approvals, or that were made to induce the Court to grant the necessary approvals, should be treated as statements that "induced" the contract itself, since the APA was not effective and binding on Voyager unless and until I approved it. BAM's counsel agreed that they should be so treated. October 9, 2025 Hr'g Tr. at 29:10-30:19.

BAM argues that the way BAM actually held customer assets, and the fact that such assets were commingled with company assets, are matters that BAM had no affirmative duty to reveal to Voyager, and that BAM also had no duty to correct any misimpressions under which Voyager (or this Court) may have been operating. ECF No. 35 at 22. I cannot agree that as a matter of law this argument would warrant the dismissal of Voyager's Counterclaim.

Section 161 of the Restatement of Contracts addresses the circumstances under which a person's non-disclosure of a fact (in this case, that BAM commingled customer assets with its own assets) is equivalent to an affirmative assertion that the fact does not exist:

> A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only: (a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material; (b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is

> making the contract and if non-disclosure of the fact amounts to a failure to
> act in good faith and in accordance with reasonable standards of fair dealing;
> (c) where he knows that disclosure of the fact would correct a mistake of the
> other party as to the contents or effect of a writing, evidencing or embodying
> an agreement in whole or in part; [and] (d) where the other person is entitled
> to know the fact because of a relation of trust and confidence between them.

Restatement (2d) of Contracts § 161.  Comment a to section 161 confirms that "[l]ike

concealment, non-disclosure of a fact may be equivalent to a misrepresentation."  *Id.*.  If a party

discloses some facts but omits such additional matters that he knows or believes to be necessary

to prevent the disclosures from being misleading, the party has made a misrepresentation.  *Id.*

Comment c also makes clear that if a party makes an incorrect statement, and then later discovers

the error, the failure to correct the prior statement has the same consequence as if the person had

knowledge of the error at the time of the original assertion.  *Id.*, cmt. c.

 One Delaware decision held, in 2013, that section 161 of the Restatement of Contracts

had not necessarily been adopted by the Delaware courts.  *Price v. State Farm Mut. Auto. Ins.

Co.*, C.A. No. N11C-07-069 (RRC), 2013 Del. Super. LEXIS 102, at *46-47 (Del. Super. Mar.

15, 2013).  Other Delaware decisions – including decisions that both pre-date and post-date the

*Price* decision – have cited approvingly to section 161 of the Restatement.  *See Columbus US

Inc. V. Enavate SMB, LLC*, C.A. No. N22C-06-053 (SKR), 2024 Del. Super. LEXIS 828, at *27

(Del. Super. Dec. 23, 2024) (citing to the relevant Restatement sections in support of the

proposition that under Delaware law a misrepresentation may take the form of "(1) an overt

misrepresentation, (2) deliberate concealment of material facts, or (3) silence in the face of a

duty to speak"); *Glidepath Ltd. v. Beumer Corp.*, C.A. No. 12220 (VCL), 2018 Del. Ch. LEXIS

178, at *32 n. 118  (Del. Ch. Jun. 4, 2018) (holding, in the context of a "mistake" claim, that a

knowing silence in the face of a material misunderstanding is a misrepresentation); *Walker v.

Resource Dev. Co., L.L.C.*, 791 A.2d 799, 816 n. 58 (Del. Ch. 2000)(citing the Restatement in

support of the proposition that "a failure to voluntarily disclose information in certain instances amounts to misrepresentation"); *ASB Allegiance Real Estate Fund v. Scion Breckenridge Managing Member, LLC*, C.A. No. 5843 (VCL), 2013 Del. Ch. LEXIS 236, at *20-21 (Del. Ch. Sept. 16, 2013) (citing the Restatement and holding that a party's failure to correct another party's misunderstandings is equivalent to a misrepresentation); *In re Wayport, Inc. Litig.*, 76 A.3d 296 (Del. Ch. 2013) ( holding that a duty to speak may arise because of statements previously made and that a party to a business transaction is under a duty to disclose if, prior to closing, the party learns of information that shows that a prior representation was misleading or untrue or that it is no longer true).

Voyager's Counterclaims allege that BAM and its representatives (1) knew that the manner in which customer assets would be held was material to Voyager and to this Court, (2) knew that Voyager and this Court understood that BAM's wallet structure was such that customer assets were segregated from BAM's own assets, (3) confirmed to this Court that the wallet infrastructure was such that customer assets were segregated from BAM's assets, (4) failed to correct the prior statements by BAM's counsel, (5) made deliberately misleading statements about these same matters in the Officer's Certificate even after the Court had asked for confirmation, in that certificate, that the Court's prior understandings were correct, and (6) did all of these things with the intent that Voyager and the Court would be misled and would rely on their misunderstandings as to how BAM treated such assets. These allegations state a valid claim that BAM was guilty of a misrepresentation under the legal standards cited above.

The bigger problem, for Voyager, is whether section 4.10 of the APA bars a fraud claim based on BAM's in-court statements and BAM's failures to correct the statements that were made. I conclude that it does. All of the evidence regarding BAM's statements in Court and in

the Officer's Certificate will be relevant and admissible as evidence of what the parties actually understood BAM's "trust" obligations to be, and they may be relevant and admissible as well in considering whether BAM's representation that it had the "power and authority" to "perform" its obligations was materially misleading.  However, section 4.10 of the APA bars Voyager from relying on them as stand-alone grounds for a fraud claim.

### E.      Whether the Economic Loss Doctrine Bars the Fraud Claim

BAM argues that the "economic loss doctrine" bars Voyager's fraud claim.  The judicially-created economic loss doctrine prohibits certain claims in tort where overlapping claims based in contact adequately and completely address the injury alleged, on the theory that contract law provides a better and more specific remedy than tort law.  *See Arkray Am., Inc. v. Navigator Bus. Sols., Inc.*, C.A. No. N20C-12-012 (MMJ), 2021 Del. Super. LEXIS 463, at *16-17 (Del. Super. Jun. 9, 2021).  However, "like Delaware's bootstrapping doctrine, the economic loss doctrine does not function as a blanket ban on all parallel tort and contract claims." *Id.*  By its nature the economic loss doctrine applies where a contract remedy actually exists, and not merely where a contract remedy is claimed.  The economic loss doctrine also does not apply where damage claims are based on the fraudulent inducement to a contract rather than on a failure of performance.  *Brasby v. Morris*, C.A. No. 05C-10-022 (RFS), 2007 Del. Super. LEXIS 73, at *22 (Del. Super. Mar. 29, 2007).  It also does not apply where the damages that are attributable to fraud differ from those that are attributable to a breach of contract.  *See Swipe Acquisition Corp. v. Krauss*, 2020 Del. Ch. LEXIS 276, at *28 (declining to dismiss an allegedly duplicative fraud claim because "Plaintiff's damages could be different in the event that it prevails on its fraud claim . . .").

The economic loss doctrine does not warrant a dismissal of Voyager's fraud claims at the pleading stage.  Voyager contends that BAM fraudulently induced it to enter into and to obtain approval of the APA and of the plan that made its terms effective, and Voyager has asserted that it suffered damages (extra expenses, for example) that differ from its contract damage claims.  BAM also has argued that it validly terminated the APA because the closing deadline had passed.  If that position is sustained at trial, it would mean that Voyager has no contract claim.  This therefore is not a case where proof of the alleged fraud would automatically also constitute proof of a breach of contract and where contract damages automatically would be available for the conduct that allegedly represented a fraud.

## III.    Voyager's Contract Counterclaims

Voyager has asserted three contract-based Counterclaims in addition to the fraud claim discussed above.  The first Counterclaim alleges that BAM wrongly terminated and repudiated the APA and that Voyager is entitled to damages.  The third Counterclaim alleges, in the alternative, that if the APA was validly terminated then Voyager is entitled to keep the $10 million as a "reverse termination payment" under section 8.1(c) of the APA.  The fourth counterclaim alleges, in the alternative, that if the APA was validly terminated and if Voyager was not entitled to the reverse termination fee Voyager nevertheless is entitled to retain BAM's deposit.

### A.    The Counterclaim Alleging Wrongful Termination of the APA

BAM and Voyager agreed that the APA could only be terminated in accordance with the provisions of section 8.1 of the APA.  One possible ground for termination was a failure to close by the "Outside Date," which was April 18, 2023.  Section 8.1(c) provided that the APA could be terminated:

  (c) by written notice of either Purchaser or Seller if the Closing shall not
  have occurred on or before the date date that is four (4) months following the date
  hereof (the "Outside Date"); provided that Purchaser may, at its election and
  upon written notice to Seller, elect to extend the Outside Date for an
  additional thirty (30) days (such extended date, the "Extended Outside
  Date"); *provided further that a Party shall not be permitted to terminate this
  Agreement*, or extend the Outside Date, pursuant to this Section 8.1(c) *if the
  failure of the Closing to have occurred by the Outside Date or Extended
  Outside Date, as applicable, was caused by such Party's material breach of
  any of its representation, warranties, covenants or agreements*;

APA, § 8.1(c) (emphasis added).  BAM invoked this provision when it terminated the APA on

April 25, 2023.  Voyager contends that the failure to complete a closing by the Outside Date was

caused by BAM's own material breach of its representations, covenants and agreements and that

BAM therefore did not have the contractual right to terminate.

  BAM has made numerous factual arguments in support of its motion to dismiss this

Counterclaim.  It argues that it was Voyager's own fault that the deal failed to close, that Voyager

was preoccupied with its attempt to get approval (on appeal) of certain exculpation provisions in

the plan of reorganization, and that Voyager was in default of its own obligations.  These factual

contentions are not based on the allegations of the Counterclaims themselves, and they are not a

proper basis for a motion to dismiss.

  BAM also argues that if it was not entitled to terminate the APA then that should just

mean that the termination was "ineffective," rather than that BAM breached the agreement.  This

argument makes no sense.  BAM's termination notice made clear that BAM did not intend to

proceed with the transaction.  *See* Complaint (AP ECF No. 1), Ex. 2(A) (stating that BAM was

terminating the APA and asserted that BAM had no further liability or obligation thereunder).

Voyager alleges that it contested BAM's purported termination of the APA and that it attempted

to get BAM to honor its obligations, but that BAM refused.  Voyager correctly argues that this

was a repudiation of BAM's obligations to proceed.  If (as Voyager contends) BAM did not have

45

a contractual right to terminate, then BAM's actions were a breach and repudiation of the APA.

*In re Broadsripe, LLC*, 435 B.R. 245, 261 (Bankr. D. Del. 2010) (a repudiation of a contract

occurs where a party's statements show that it will not or cannot perform its obligations);

*Premium Choice Ins. Servs. v. Innovative Fin. Grp. Holdings, LLC*, C.A. No. N24C-01-006

(PRW), 2024 Del. Super. LEXIS 497, at *5-7 (Del. Super. July 9, 2024) (an outright refusal to

perform is a repudiation of a contract).

BAM also argues that it did not "repudiate" its obligations but that instead it merely

asserted that it had practical difficulties in complying with those obligations.  ECF No. 35 at 8,

17.  The termination notice that BAM sent was much more than a statement that compliance with

the contract would be difficult; it was an unequivocal refusal to go forward.  The Counterclaims

also allege that BAM was required to segregate customer assets and that in advance of sending

the termination notice BAM had made clear that it did not intend to comply with this

requirement.  Under the facts as they have been alleged by Voyager, BAM's various

counterproposals were just proposals to amend or delete the "trust" provisions of the APA, not

efforts to conform to it.  Voyager has also alleged that BAM's suggestions that it was considering

other solutions were just efforts to delay rather than honest efforts to address the underlying

issue.  Those allegations (if true) are sufficient to state a claim of anticipatory repudiation under

the authorities cited above.  BAM may disagree with the facts that have been alleged, but those

disagreements are issues for trial.

**B.    The Reverse Termination Fee**

Section 8.3 of the APA states, in relevant part, that if the conditions set forth in sections

7.1(b), 7.1(c) and 7.2 of the APA had been fully satisfied or waived, and if the APA then was

"validly" terminated or if Purchaser failed to consummate a closing by the Outside Date due to a

failure of the conditions set forth in section 7.1(a), then Voyager would be entitled to a "Reverse Termination Fee" in the amount of $10 million.  APA, § 8.3.  Section 7.1(a), which is referenced in section 8.3, required that there be no law or order in place that restrained, enjoined, made illegal or otherwise prohibited the Transactions.  *Id.,* § 7.1(a).  Voyager alleges that the relevant conditions had been satisfied and that BAM had affirmatively acknowledged the same.  It therefore argues, in the alternative, that Voyager would be entitled to the Reverse Termination Fee even if the APA had been validly terminated by BAM.

BAM argues that a Reverse Termination Fee is only payable following a "valid" termination of the APA and that it is inconsistent for Voyager to contend that the APA was not validly terminated (as Voyager has primarily argued) and then also to contend that Voyager is entitled to a Reverse Termination Fee.  However, pleading in the alternative is permitted by the applicable rules.  *See* Fed. R. Civ. P. 8, Fed. R. Bankr. P. 7008.  BAM contends that the termination was valid, and there is nothing improper in Voyager's contention that even if this were the case Voyager would still be entitled to the Reverse Termination Fee.

BAM also argues that one of the conditions to a closing was that a certificate was to be delivered that confirmed that certain representations continued to be true as of the closing, and that this condition was not satisfied (and could not have been satisfied) because the closing never occurred.  ECF No. 35 at 34-36.  This argument makes no sense.  The Reverse Termination Fee was only payable in the event that a Closing did not occur, which necessarily would mean that the relevant representations had not been carried forward through the date of a "closing."  BAM's interpretation would make the entire provision meaningless, which would be contrary to all ordinary rules of contract interpretation.  *Manti Holdings, LLC v. Authentix Acquisition Co., Inc.*, 261 A.3d 1199, 1208 (Del. 2021)(contracts are to be interpreted so as not to render any

terms meaningless or illusory and so as not to produce an absurd result); *Williams Cos., Inc. v. Energy Transfer LP,* C.A. No. 12168-VCG, 2020 Del. Ch. LEXIS 229, at *32 (Del. Ch. July 2, 2020) (refusing to adopt an interpretation that would have rendered a provision illusory).

In addition, it was BAM who terminated the APA and therefore prevented a Closing from occurring. BAM's own termination made it impossible to comply with any condition that was to be satisfied at a closing itself, since no such closing could occur. BAM cannot rely on the failure to satisfy a condition when BAM itself had made it impossible for the condition to be satisfied. *BitGo Holdings, Inc. v. Galaxy Digit. Holdings, Ltd.*, 319 A.3d 310, 333 (Del. 2024) (a party may not escape contractual liability by reliance upon the failure of a condition precedent where the party wrongfully prevented performance of that condition precedent.)

BAM has raised factual arguments as to the parties' compliance with their respective obligations and the reasons why the transaction did not close, but those all are factual issues to be resolved at trial.

### C.    The Deposit

BAM paid a $10 million deposit when the APA was executed. Section 2.2(b) of the APA provides that if the APA "has been validly terminated" by BAM in circumstances under which Voyager would be entitled to terminate under sections 8.1(d) or 8.1(g), then Voyager is entitled to retain the deposit. APA, § 2.2(b). Section 8.1(d) permitted Voyager to terminate in the event of a breach of any covenant or agreement by BAM or if any representation or warranty by BAM had become or would become untrue. *Id.*, § 8.1(d). Section 8.1(g) permitted Voyager to terminate if proceeding to a closing would violate Voyager's fiduciary duties. *Id.*, § 8.1(g).

Voyager's primary argument, as described above, is that the APA was not validly terminated. It has also argued, in the alternative, that even if the termination was valid Voyager would be entitled to retain BAM's deposit pursuant to the terms of section 2.2(b) of the APA.

BAM argues that Voyager cannot assert claims based on the invalid termination of the APA and then also assert a claim that depends on a valid termination. However, pleading in the alternative is permitted by the applicable rules. BAM contends that the termination was valid, and there is nothing improper about Voyager's contention that even if that were true Voyager would still be entitled to retain the deposit.

BAM argues that Voyager could not have terminated the APA because Voyager had not sent the notice of termination that the APA would have required. However, section 2.2(b) refers to situations in which Voyager would have been "entitled" to terminate the APA, and not just to situations in which Voyager had actually invoked a termination right.

BAM also has argued that a commingling of customer assets with BAM assets would at most have been a "future" breach of the "trust" provisions of the APA and did not constitute a breach at the time that the APA was terminated. As explained above, Voyager has alleged that the "trust" provision required a segregation of assets and that BAM had made very clear, in advance, that BAM did not intend to comply with that obligation. Voyager has stated a valid claim that this constituted an anticipatory repudiation and breach of the APA, as already discussed above.

Finally, BAM makes a host of factual arguments as to whether Voyager was in compliance with its own obligations, whether BAM had actually repudiated its obligations, whether a segregation of assets was required, and other matters. None of these are proper grounds for a motion to dismiss.

IV.     **Whether the APA Restricts the Damages Voyager Can Seek for Fraud**

BAM asserted in its motion papers that certain provisions of the APA limit the damages

that Voyager may seek.  More particularly, section 8.4(a) states that if the Deposit is payable to

Voyager under section 2.2(b) of the APA, or if the Reverse Termination Fee is payable to

Voyager under section 8.3 of the APA, then that shall be Voyager's sole and exclusive recourse.

APA, § 8.4(a).  Section 8.4(c) of the APA states that if a closing does not occur, and if the

Deposit is forfeited under section 2.2(b) of the APA or a Reverse Termination Fee and/or Seller

Expenses are payable under sections 6.21 and 8.3, then those amounts shall constitute the

maximum aggregate liability of BAM.  *Id.* § 8.4(c).  BAM argues that these provisions somehow

cap its maximum liability, under all of Voyager's claims, at $10 million.  There are three

problems with BAM's contention.

First, the relevant sections of the APA (sections 2.2(b), 6.21 and 8.3) all contemplate a

situation in which a "valid" termination of the APA has occurred.  If the termination was invalid

(as Voyager claims it was) then the limitations of section 8.3 do not apply.  When these

provisions were reviewed with the parties during oral argument, BAM's counsel conceded that

this is the correct interpretation of section 8.3.

Second, Section 8.2(a) of the APA states that if the agreement is terminated, and if the

limits in section 8.3 do not apply, then "no termination will relieve either Party from any

Liability for damages (including damages based on the loss of the economic benefits of the

Transactions, including the Purchase Price, to Seller)" that result from "any willful breach of this

Agreement by such Party prior to any such termination or Fraud by such Party." APA. § 8.2(a).

Section 10.21 also states that, notwithstanding any other provision of the APA, "nothing herein

shall relieve any Person from any Liability on account of Fraud."  *Id*. § 10.21.

50

Third, the *Abry* decision, cited above, confirmed that contractual limits on the remedies that parties may seek for fraud may be contrary to Delaware public policy, at least to the extent the fraud was intentional. *Abry Partners V, L.P.*, 891 A.2d at 1060. The extent to which such limits should be applied here is a question better left for trial. It is enough to say, at the pleading stage, that I cannot agree with BAM's contention that Voyager's potential damages are contractually capped.

## Conclusion

For the foregoing reasons, BAM's motion to dismiss Voyager's Counterclaims is denied, though Voyager's pursuit of its fraud claim shall be subject to the rulings set forth in this Decision. The parties are directed to submit a scheduling order by December 12, 2025 to govern the remaining pretrial proceedings in this matter.

Dated:  New York, New York
        November 25, 2025

                                s/Michael E. Wiles
                                HONORABLE MICHAEL E. WILES
                                UNITED STATES BANKRUPTCY JUDGE